KOG
9/13/17
PMC USAO#2013R00888

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

2017 SEP 13 PM 4: 24

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. GCB-17-0480 |
| JULIET LUO,<br>  a/k/a  Juliet Zhang,<br>  a/k/a  Hong Luo,<br>KE "Jack" ZHANG,<br>  and<br>MICHAEL GRAYSON, | (Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349) |
| Defendants. | |

## INDICTMENT

### COUNT ONE
(Conspiracy to Commit Wire Fraud)

The Grand Jury for the District of Maryland charges that:

**A.  INDIVIDUALS AND ORGANIZATIONS**

At all times relevant to this Indictment:

1. Defendant JULIET LUO, a/k/a Juliet Zhang, a/k/a Hong Luo, a resident of Frederick, Maryland, was one of the co-founders and owners of CaerVision Corporation (hereinafter CaerVision) and its related company, CaerVision Technology Center, Inc. ("CTCI"). From at least June 2009, until at least in or about April 2017, LUO was married to defendant KE "Jack" ZHANG. From in or about November 2016, LUO functioned as the President/Chief Executive Officer of CaerVision.

2. Defendant KE "Jack" ZHANG was one of the owners or former owners of CaerVision and prior to his divorce from LUO, served as the Chief Executive Officer of the company.

1

3. Defendant MICHAEL GRAYSON began employment with CaerVision on or about April 2014, in the capacity of Chief Operating Officer. Following the departure of KE "Jack" ZHANG, GRAYSON assumed responsibility for many of the day-to-day operations of CaerVision.

4. CaerVision was a multi-national business headquartered in Ijamsville, Maryland, that designed and operated digital media systems displayed in waiting rooms of health care facilities to turn patient waiting time into educational opportunities.

B. **BACKGROUND ON UNITED STATES IMMIGRATION LAW AND PROGRAMS**

5. The term "alien" is defined in the Immigration and Nationality Act as any person who is not a citizen or national of the United States.

6. U.S. visas are issued by the U. S. Department of State, an agency of the executive branch of the U.S. government.

7. A "non-immigrant visa" provides an alien with a temporary stay in the United States, while an "immigrant visa" is issued for permanent residence in the United States.

8. The application form for a non-immigrant visa is Department of State Form 156 (Form DS-156). The supplemental application form for a non-immigrant visa is Department of State Form 157 (Form DS-157).

9. U.S. Citizenship & Immigration Services ("USCIS") is a sub-agency of the U.S. Department of Homeland Security ("DHS") and oversees lawful immigration to the United States.

### The EB-5 Investor Visa Program

10. The Immigrant Investor Visa Program, also known as the "EB-5 Visa Program," was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital

investments made by immigrant investors in new commercial enterprises or troubled businesses. The EB-5 Visa Program is administered by USCIS.

11. In order to qualify, the immigrant must make a capital investment of $1,000,000, or if the investment is in a Targeted Employment Area ("TEA") located within the United States, a capital investment of $500,000. The investment must create or preserve 10 full-time jobs for qualifying United States workers within two years.

12. Acquiring lawful permanent residency (a "Green Card") through the EB-5 Visa Program is a three-step self-petitioning process. First, the applicant must obtain approval of his or her Petition for an Alien Entrepreneur (Form I-526) from USCIS. Second, he or she must either file a Form I-485, Application to Adjust Status to Lawful Permanent Resident, or apply for an immigrant visa at a U.S. Consulate or Embassy outside of the United States. The EB-5 applicant (and his/her derivative family members) is granted conditional permanent residency for a two-year period upon the approval of the Form I-485 application or upon entry into the United States with an EB-5 immigrant visa. Third, a Form I-829, Petition by an Entrepreneur to Remove Conditions, must be filed 90 days prior to the two-year anniversary of the granting of the EB-5 applicant's conditional Green Card. If this petition is approved by USCIS, the EB-5 applicant will be issued a new Green Card without any further conditions attached to it, and will be allowed to permanently live and work in the United States.

13. To qualify as an EB-5 investment, the immigrant investor must actually place his or her capital "at risk" for the purpose of generating a return and evidence of such risk must accompany the EB-5 petition. If the immigrant investor is guaranteed the return of a portion of his or her investment, then that portion of the capital is not at risk.

## L-1 Visa Program

14. Foreign companies desiring to support existing U.S. operations or to establish a new office in the U.S. can send an existing employee to work in the U.S. in a managerial or executive capacity on a non-immigrant visa. The L-1 visa classification covers this type of travel. To qualify for L-1 classification in this category, the employer must:

    a. Have a qualifying relationship with a foreign company (parent company, branch, subsidiary, or affiliate, collectively referred to as qualifying organizations); and

    b. Currently be, or will be, doing business as an employer in the United States and in at least one other country directly or through a qualifying organization for the duration of the beneficiary's stay in the United States as an L-1. While the business must be viable, there is no requirement that it be engaged in international trade.

15. To qualify, the transferring employee must also:

    a. Generally have been working for a qualifying organization abroad for one continuous year within the three years immediately preceding his or her admission to the United States;

    b. Be seeking to enter the United States to provide service in an executive or managerial capacity for a branch of the same employer or one of its qualifying organizations; and

    c. Submit a Form I-129 Petition for a Nonimmigrant Worker.

## H-1B Visa Program

16. The H-1B visa program allows American businesses to temporarily employ foreign workers with specialized or technical expertise in a particular field such as accounting, engineering, or computer science. Generally, the H-1B program is designed to allow American businesses to employ highly educated foreign workers, but only under strict conditions.

17. Before hiring a foreign worker under the H-1B visa program, the employer must have obtained approval from the Department of Labor ("DOL") by filing a Labor Condition Application ("LCA"). In the LCA, the employer represents that as of the date of the filing, a job vacancy or vacancies existed, and it intends to employ a specified number of foreign workers for specific positions, at specific geographical locations, for a particular period of time. The employer is required by DOL to make truthful representations regarding the foreign worker's rate of pay, work location, and whether the position is full-time. The employer must represent that it would pay the foreign worker (hereinafter "beneficiary") for non-productive time – that is, an employer who sponsors a beneficiary is required to pay wages and other benefits to the beneficiary, even if he or she was not actively working for certain periods of time. Employers are prohibited by program regulations from requiring that beneficiaries pay, directly or indirectly, any part of the LCA or petition filing fee, administrative fees, attorney fees or any other costs related to the H-1B petition.

18. Upon approval of the LCA by DOL, the employer must then obtain permission from DHS and USCIS to hire a specific, named individual. The employer obtains this approval by filing a Form I-129 Petition for a Nonimmigrant Worker and paying a processing fee to DHS. Once USCIS approved the petition, the beneficiary submits a visa application to the Department of State at a U.S. Consulate or Embassy overseas, or the beneficiary's status is changed and/or extended as requested in the petition, if the beneficiary is already located in the U.S.

19. Once the beneficiary is issued the H-1B visa, he/she possesses lawful non-immigrant status until the expiration of the visa (typically three years, with an option for renewal) or the end of employment with the sponsoring employer. If the employment ends, the employer is obligated to notify USCIS of that fact and pay for the beneficiary to return to his/her native country. The employer must have begun payment of salary to the beneficiary within 60

5

days of visa issuance, if he/she was already in the United States or within 30 days of admission to the United States if the beneficiary lived abroad.

C. **THE CONSPIRACY AND SCHEME TO DEFRAUD**

20. Beginning in or about 2009 and continuing through in or about August 2017, in the District of Maryland and elsewhere, the defendants,

**JULIET LUO,
a/k/a   Juliet Zhang,
a/k/a   Hong Luo,
KE "Jack" ZHANG,
and
MICHAEL GRAYSON,**

did knowingly and willfully conspire with each other and other persons known and unknown to the Grand Jury to devise, execute and attempt to commit certain offenses against the United States, that is: to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and did knowingly transmit and cause to be transmitted, by means of wire communications, writings and signals in interstate and foreign commerce certain writings, signs, signals, pictures and sounds, for the purpose of executing such scheme or artifice in violation of Title 18, United States Code, Section 1343.

D. **PURPOSE OF THE SCHEME TO DEFRAUD AND CONSPIRACY**

21. It was the purpose of the conspiracy and scheme to defraud for the defendants to enrich themselves through the misappropriation of funds of foreign investors who hoped to participate in the EB-5 Investor Visa Program, the L-1 Visa Program, and the H1-B Visa Program, by deceiving the foreign investors and United States officials about the use of said investment funds.

E.  **MANNER AND MEANS OF THE CONSPIRACY AND SCHEME TO DEFRAUD**

22. It was part of the conspiracy and scheme to defraud that the defendants and their co-conspirators solicited Chinese nationals and persons of other nationalities who were interested in obtaining legal status to be in the United States through the EB-5, L-1 and H-1B Visa Program as investors ("the Investors").

23. It was further part of the conspiracy and scheme to defraud that the defendants and their co-conspirators created businesses identified as Joint Ventures ("JVs") in relationship with CaerVision to facilitate the Investors' visa applications.

24. It was further part of the conspiracy and scheme to defraud that the defendants and their co-conspirators falsely promised to the Investors that they would utilize the Investors' capital contributions solely for the investment projects associated with the EB-5 Visa Program.

25. It was further part of the conspiracy and scheme to defraud that the defendants and their co-conspirators caused money to be transferred by wire transmission from the Investors' accounts in China and other locations outside of Maryland to bank accounts associated with CaerVision and the JVs in Maryland.

26. It was further part of the conspiracy and scheme to defraud that the defendants and their co-conspirators established and used multiple bank accounts to conceal the manipulation and distribution of the Investors' capital contributions between CaerVision controlled accounts.

27. It was further part of the conspiracy and scheme to defraud that the defendants and their co-conspirators transferred and caused to be transferred funds by wire transmission between CaerVision bank accounts and the JVs" bank accounts for the purpose of concealing the financial conditions of CaerVision and the JVs.

7

28. It was further part of the conspiracy and scheme to defraud that the defendants and their co-conspirators disseminated false and misleading bank account statements and business descriptions to some or all of the Investors and potential investors to lull them into believing the business models were viable and safe, when in fact, the businesses were not viable and the Investors' capital was not spent as represented.

29. It was further part of the conspiracy and scheme to defraud that the defendants and their co-conspirators falsely represented to USCIS, in I-526 petitions, that applicants had $500,000 of capital contributions at risk when, in fact, the capital contributions, or parts thereof, had already been spent or distributed on expenses unrelated to the investment project associated with the respective EB-5 Visa Program, including but not limited to using the Investors' funds to purchase real property on behalf of the defendants, to purchase or lease of vehicles for the defendants, and to make refunds to other EB-5 investors who demanded returns of their investment funds.

30. It was further part of the conspiracy and scheme to defraud that the defendants and their co-conspirators forged and caused to be forged the signatures of some or all of the Investors and other parties on documents submitted to USCIS and other federal agencies in order to make it appear that prerequisites for the issuance of various visas had been met when, in fact, they had not been met.

18 U.S.C. § 1349

*[signature]*
Stephen M. Schenning
Acting United States Attorney

A TRUE BILL

**SIGNATURE REDACTED**

Foreperson
Date: 9/13/17